1
2
3
4
5
6
7
8                         IN THE UNITED STATES DISTRICT COURT

9                        FOR THE EASTERN DISTRICT OF CALIFORNIA

10   JAMES S. GRILL,

11               Plaintiff,

12        vs.                                    No. 2:10-cv-0757 GEB GGH PS

13   TOM QUINN,                                  ORDER AND

14               Defendant.                      FINDINGS AND RECOMMENDATIONS

15   _____/

16            Previously pending on this court's law and motion calendar for January 17, 2013,

17   were the parties' cross-motions for summary judgment, as well as plaintiff's motion to amend the

18   amended complaint and motion to introduce extra-record evidence.  Plaintiff appeared at the

19   hearing in pro se.  Defendant (hereafter Forest Service) was represented by Alison Garner.

20            The case, much like the underlying dispute and proceedings, has been long and

21   complex.  Plaintiff sought and received a special use permit (SUP) from the Forest Service in

22   order to provide access to his property, found at one time to be landlocked by National Forest

23   lands.  The SUP, officially issued in 1998 and lasting 10 years subject to renewal, gave him

24   permission to construct a road and bridge conditioned upon Forest Service approval of the design

25   and consequent environmental impacts.  Although the administrative record initially reveals a

26   number of halting steps to obtain approval for the construction, nothing of significance occurred

                                            1

until the eleventh hour of the SUP term.  The dispute in this case revolves around the Forest Service actions in effectively "terminating" the SUP at this time.

However, recent events have simplified the undersigned's findings and recommendations on the summary judgment motions.  Plaintiff Grill no longer owns the property at issue.  Therefore, he no longer has standing to seek relief under the Administrative Procedures Act (APA) which provides for a type of injunctive/mandate relief only, nor does he have any standing to seek injunctive relief under a procedural due process rubric.  Grill does have standing to seek damages for any found violation of his procedural due process rights.  The undersigned finds on the merits that Grill's procedural due process rights were violated.  However, sovereign immunity prevents Grill from recovering any damages from the Forest Service (United States).

As explained below, plaintiff's request to introduce documents into the administrative record, filed January 9, 2013, is denied.  Plaintiff's motion to amend the complaint is denied.

FACTS[1]

Plaintiff apparently lived, or had ownership of other property, proximate to the private parcel at issue herein (the "Parcel") in the Tahoe National Forest.[2]  He purchased the Parcel in the very early 1990s.  Access to this Parcel was in part over Forest Service lands, and at least one potential access crossed a creek on Forest Service Lands as well.

Plaintiff had difficulties with his purchased Parcel from the outset.  His neighbors believed that plaintiff was going to engage in an unrestrained and damaging-to-the-environment

---

[1] These facts are modeled upon those facts set forth in the Findings and Recommendations issued December 29, 2010, (Dkt. no. 19.), as supplemented by the administrative record filed in this case.

[2] Plaintiff sometimes approached the Forest Service as an individual, but also as the manager of corporations which "owned" the Parcel.  Although the SUP at issue herein was issued to plaintiff Grill himself, apparently a limited liability corporation, Western Rivers Preservation, was asserted as the real party in interest at the time the SUP was "terminated and not renewed."  Because no party herein takes the position that some entity besides Grill is the real party in interest for this litigation, the court will not raise this issue *sua sponte* either.

development.  Plaintiff was also early-on engaged in a back-and-forth access negotiation with the Forest Service.  Plaintiff filed a quiet title lawsuit against the neighbors which was ultimately resolved.  Also named in the lawsuit was the United States.  However, the United States was not served as negotiations over a special use permit for access and bridge construction continued while the threat of litigation was used as a prod for these seemingly interminable negotiations.  See Administrative Record (AR) 82, 235, 278, 295, 509, 515, 531.

Due to the threatened litigation in state court, plaintiff and the Forest Service agreed that plaintiff had a right to access his newly acquired parcel over Forest Service property pursuant to the provisions of Alaska National Interest Land Conservation Act (ANILCA § 1323(a)), 16 U.S.C. 3210 (a).  See e.g., AR 531.  Access required the building and/or the refurbishing of a road, and most importantly for this litigation, the construction of a bridge over Scotchman Creek.

Resolution of the threatened lawsuit required the preparation of an environmental report and the issuance of a SUP by the Forest Service.  Plaintiff submitted proposed plans of some sort to the Forest Service, and work commenced on an Environmental Assessment.  On or about November 27, 1995, the Environmental Assessment ("EA") was issued followed closely by the FONSI (Finding of No Significant Impact), (AR 481), but the SUP was not issued (according to the exhibits) until November 17, 1998.[3]  (AR 591, 626.)[4]  The SUP, (AR 591), was issued for the purpose:

---

[3] The record indicates that one hand of the Forest Service did not know what the other hand was doing.  AR 626, dated November 24, 1998 enclosed a "fully executed" copy of the SUP, while AR 638, dated January 12, 1999 indicated that no executed SUP would be issued until "construction stipulations" and engineering drawings for the bridge were submitted.  (AR 638.)

[4] It appears that the issuance of the SUP was conflated with satisfaction of the terms and conditions of the SUP.  Thus, it took years from the agreement in principle to issue a SUP until an "executed" SUP was issued.  Finally, it was agreed that plaintiff could submit the "construction stipulations," but that the engineering drawings would be submitted at a later date.  See AR 641.

to gain vehicle access to private property, which is landlocked by National Forest System Lands.  Use also includes construction and maintenance of a bridge on
said roadbed and burying and maintaining a 6" or less utility conduit in said roadbed.

Importantly,

> 2. The Permittee in exercising the privileges granted by this permit shall comply with all applicable State and Federal laws, Executive Orders, and Federal rules and regulations, and shall comply with all State standards for public health and safety, environmental protection, and siting construction, operation, maintenance of or rights-of-way for similar purposes if those standards are more stringent than applicable Federal standards.

Other provisions pertinent to the motions herein:

> 8. All construction or reconstruction of the road shall be in accordance with plans, specifications, and written stipulations approved by the Forest Service prior to beginning such reconstruction. (See Exhibit B)
> ***
> 15.  This permit may be terminated or suspended upon breach of any of the conditions herein.
> ***
> 20.  Unless sooner terminated in accordance with the terms of this permit, this permit shall expire and terminate on December 31, 2007.  At that time, if the permittee still needs the road for the purposes for which the permit is granted, the permit *will be* reissued for successive periods of 10 years.  At the time of reissuance, the terms and conditions may be modified and new conditions or stipulations added at the discretion of the Forest Service. (Emphasis added)

For reasons which are not fully explained by plaintiff, progress on plans for the construction proceeded in fits and starts for nearly ten years.  See e.g., AR 681-831.  However, more activity was exhibited in 2006, and plaintiff appeared "ready to go" in 2007, some few months before the initial SUP was to expire by its own terms.  In July of 2007, plaintiff was issued a building permit by Nevada County.  (AR 849.)  By e-mail to plaintiff, also in July 2007, the Forest Service indicated its approval to begin construction: "The Forest Service has approved your submitted bridge design...[and will] allow immediate construction pending submittal of a stream alteration permit..."  (AR 874.)  California Fish and Game also approved of the project,

4

especially the bridge construction, in 2007 as well. (AR 894.)

However, the just approved construction was halted a scant month or so later due to alleged environmental concerns which had not been addressed in the prior EA analysis. (AR 911.)  Cal. Fish and Game thereupon suspended its permit.  (AR 918.)  Plaintiff was told, "[d]o not proceed with any plans or any surface disturbing activities at the site pending further notification."  (Compl., Ex, K; Dkt. no. 49, Ex. D.)  On October 5, 2007, plaintiff was given the "back to square one" letter (AR 920) – even worse, in that plaintiff was to be tasked with further large expenditures if he decided to pursue the road and bridge.  The Forest Service, now, did not like the bridge plans after all, and stated:

> Since so much time has passed since the issuance of the Environmental Analysis, and since your permit expires December 31, 2007, and since engineering stipulations were never issued or agreed upon by both parties [despite the above approval], my decision is that the Environmental Analysis will need to be revised....We will also need to conduct surveys for all the new plants and animals which have been listed as sensitive since 1995. We will not begin any of this until an agreement has been reached and you have provided the funding needing [sic] to complete an adequate analysis.

(Id.)

The initial SUP expired on December 31, 2007.  (AR 594.)  After plaintiff attempted an informal resolution by letter dated February 4, 2008, (AR 938)[5], the Forest Service

---

[5]  Plaintiff claims that this letter was an attempt to appeal the October 5, 2007 decision by the Forest Service.  The letter addressed asserted inaccuracies in the Forest Service's October 5, 2007 letter to plaintiff.  After much analysis, plaintiff's counsel concluded, "the bridge design you purported to reject in your October 5, 2007 letter is the same bridge described in the EA and the FONSI and the same bridge approved by the Forest Service four times over the last twelve years, the latest approval coming as recently as July 31, 2007."  Plaintiff's counsel additionally stated that further environmental analysis was not required under NEPA unless there were project changes that caused new impacts.  In regard to expiration of the Permit on December 31, 2007, counsel reminded the Forest Service (again, see AR 922) that the language of the Permit provides that "at that time, [December 31, 2007] if the permittee still needs the road for the purposes for which the permit is granted, the permit will be reissued for successive periods of 10 years."  Counsel then asserted:

> The Permittee still needs the bridge and road for the same reasons

1   issued another letter on April 2, 2008, stating that new law had come into effect after the prior

2   EA/FONSI, and plaintiff would, in essence, have to start over at his own expense. (Part of AR

3   975.) Internal Forest Service emails reflect defendant's opinion that plaintiff was not required to

4   be offered appeal rights because he had failed "to comply with direction in the EA." (AR 941-

5   42.) No appeal rights were given.

6          Proceeding concurrently with the short-lived approval and cancellation of same,

7   were plaintiff's requests that his SUP be extended for another ten years since the road and bridge

8   were still needed. (AR 825, 922, 930, 938.) See also footnote 5 supra. As noted previously,

9   however, the Forest Service conflated reissuance of the SUP with the fulfillment of all

10  requirements within the SUP and previous environmental analysis. However, there is confusion

11  in the record as it was also indicated that plaintiff had not "returned the signed copy of the

12  renewal for the Maybert Road Permit." (AR 958.) In any event, the Forest Service never

13  reissued the SUP.

14  PROCEDURAL HISTORY

15         On December 29, 2010, this court issued findings and recommendations in regard

16  to the Forest Service's motion to dismiss. It defined plaintiff's breach of contract claim as an

17  APA claim in regard to 16 U.S.C. § 3210(a), ANILCA. It informed plaintiff that it had no

18  jurisdiction over his Fifth Amendment Taking claim, but informed him that he might be

19  attempting to state a claim for procedural due process, for which amendment would be permitted.

20  The undersigned also recommended dismissal of the equitable estoppel claim.

21  /////

22

23         it has always needed them, the property is landlocked in their
           absence. Thus, under the Alaska National Lands Act the Permittee
           is entitled to access. Though not required to do so under the

24         special use permit, in 2006 the Permittee specifically requested
           renewal of the special use permit.

25

26         In conclusion, plaintiff's counsel requested a meeting to work through these
    issues. (AR 939.)

6

1    On July 19, 2011, plaintiff's motion to amend was granted.  The amended

2  complaint was construed to contain a claim under section 702 of the APA arising from the

3  application of 16 U.S.C. § 3210(a), ANILCA, as well as a claim for lack of procedural due

4  process.

5    In a discovery order, filed January 20, 2012, plaintiff's motion to compel was

6  granted in part and denied in part.  Defendant was ordered to supplement the Administrative

7  Record with specific items, and defendant did so on January 26, 2012.  (Dkt. no. 49.)

8  CLAIMS

9    The Claims remaining after resolution of the motion to dismiss are as follows:

10  1.  Administrative Procedures Act Claim (regarding the Use Permit based on the prior

11  settlement)

12    The findings and recommendations issued December 29, 2010 defined this claim,

13  brought by plaintiff as a breach of contract claim, as whether the Forest Service violated the APA

14  (5 U.S.C. § 702) in connection with its application of 16 U.S.C. § 3210(a), the Alaska National

15  Interest Land Conservation Act ("ANILCA").

16  2.  Procedural Due Process Claim

17    The FAC has been construed to state a claim for lack of procedural due process

18  through the Forest Service's alleged arbitrary termination of the SUP without procedural due

19  process, and based on the allegation that defendant "informed plaintiff that there was no appeal

20  from their aforementioned administrative decisions."  (FAC ¶ 62.)

21  3.  Parties' Cross-Motions

22    Plaintiff's motion seeks summary judgment on both of these claims.  Plaintiff's

23  motion also points out that plaintiff did not receive most of the requested discovery from

24  defendant.  Plaintiff refers to this court's January 20, 2012 order wherein the court granted

25  limited discovery.  Plaintiff claims that he propounded two sets of requests for production of

26  documents, for a total of 15 requests.  Plaintiff claims that defendant's responses for the most

1   part were not forthcoming, with claims of various privileges and objections.  In sum, defendant

2   responded that it had no non-privileged documents to produce that were not already produced as

3   part of the AR.  There is no defined discovery cutoff in this case because matters are generally

4   limited to the administrative record; however, the court permitted plaintiff limited written

5   discovery to be propounded within fourteen days of the January 20, 2012 order.  (Dkt. no. 48).

6   Plaintiff was not informed of a deadline for filing a motion to compel.  Since he has filed a

7   motion to compel in the past (dkt. no. 33), he was aware that he could have done so in this

8   instance.  His discovery complaints within a motion for summary judgment process are not in the

9   proper form of a motion to compel, and therefore any such request is denied for this reason.

10          Issues raised by defendant's cross-motion are:

11   1.  Lack of Subject Matter Jurisdiction (Fed. R. Civ. P. 12(b)(1) based on lack of standing.

12   2.  The Forest Service Appropriately Administered the Special Use Permit.

13   3.  Plaintiff Received Procedural Due Process.

14   4.  If Plaintiff's motion is granted, the Appropriate Remedy is to Remand to the Agency.

15   STANDARDS

16   I.  Administrative Procedure Act[6]

17          The Administrative Procedure Act ("APA") provides the authority for review of

18   agency decisions under the National Environmental Policy Act ("NEPA") and the National

19   Forest Management Act ("NFMA").  Lands Council v. McNair, 537 F.3d 981, 987 (9th Cir.

20   2008).  The court has found that it is also the proper authority to proceed with an ANCILA

21   complaint.

22          Under the APA, the Court determines whether the agency
     action is "arbitrary, capricious, an abuse of discretion, or otherwise
23   not in accordance with law." 5 U.S.C. § 706(2)(A); City of

24   ──────────────────────

25      [6]  On review of an administrative action, the court does not use the typical summary
     judgment standard of review in Federal Rule of Civil Procedure 56.  Friends of Endangered
26   Species, Inc. v. Jantzen, 589 F.Supp. 113, 118 (N.D.Cal.1984); accord Fund for Animals v.
     Babbitt, 903 F.Supp. 96, 105 (D.D.C.1995).

Sausalito v. O'Neill, 386 F.3d 1186, 1205–06 (9th Cir.2004); e.g., Village of False Pass v. Clark, 733 F.2d 605, 609 (9th Cir.1984).

To fulfill its obligations, the Court must conduct a "thorough, probing, in-depth review" of the administrative record. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). "Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The Court is not empowered to substitute its judgment for that of the agency." Id. at 416; Florida Power & Light Co. v. Lorion, 470 U.S. 729, 744, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985) (the "factfinding capacity of the district court" is unnecessary because court must "decide, on the basis of the record the agency provides, whether the action passes muster under the appropriate APA standard of review").

The agency's "decision is entitled to a presumption of regularity." Overton Park, 401 U.S. at 415; Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv., 378 F.3d 1059, 1071–72 (9th Cir.2004) (presumption may be rebutted by evidence in the record).

The Court determines whether the agency "considered the relevant factors and articulated a rational connection between the facts found and the choice made." Baltimore Gas & Elec. Co. v. NRDC, Inc., 462 U.S. 87, 105, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983). The Court reviews whether the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

Courts should "defer to an agency's scientific or technical expertise." Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv., 422 F.3d 782, 798 (9th Cir.2005); Nat'l Wildlife Fed'n v. U.S. ACOE, 384 F.3d 1163, 1177–78 (9th Cir.2004) (when technical question is complex and qualified scientists disagree, court must give "substantial deference" to agency's judgment) (citing Baltimore Gas, 462 U.S. at 103); accord Lands Council v. McNair, 537 F.3d 981, 988 (9th Cir.2008) (en banc) (courts "do not act as a panel of scientists," instructing the agency on methodology, choosing among scientific studies, and ordering it "to explain every possible scientific uncertainty"), overruled in part on other grounds by Winter v. NRDC, Inc., 555 U.S. 7, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008), as recognized by Am. Trucking Ass'ns v. Los Angeles, 559 F.3d 1046, 1052 (9th Cir.2009).

When an agency has failed to explain its decision and judicial review is frustrated, the Court may request affidavits from the agency to explain the reasons for the action. Camp v. Pitts, 411 U.S. 138, 142–43, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); Pub. Power Council v. Johnson, 674 F.2d 791, 793–94 (9th Cir.1982). If the agency's finding is not sustainable on the existing record, the

1    Court remands to the agency for additional consideration,
investigation, and explanation. <u>Florida Power</u>, 470 U.S. at 744;
2    <u>Camp</u>, 411 U.S. at 143; <u>Johnson</u>, 674 F.2d at 794.

3  <u>SLPR, LLC v. U.S. Army Corps of Engineers</u>, 2011 WL 1648732, *6-7 (S.D. Cal. May 2, 2011).

4         However, defendant initially challenges plaintiff's standing to bring this action, an

5  issue of subject matter jurisdiction.  This issue is properly reviewed under the general standards

6  applicable to a Fed. R. Civ. P. 12(b)(1) motion.

7         On a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction,

8  plaintiff bears the burden of proof that jurisdiction exists.  <u>See, e.g.</u>, <u>Sopcak v. Northern</u>

9  <u>Mountain Helicopter Serv</u>., 52 F.3d 817, 818 (9th Cir. 1995); <u>Thornhill Pub. Co. v. General Tel.</u>

10  <u>& Electronics Corp</u>., 594 F.2d 730, 733 (9th Cir.1979).  Different standards apply to a 12(b)(1)

11  motion, depending on the manner in which it is made.  <u>See, e.g.</u>, <u>Crisp v. U.S.</u>, 966 F.Supp. 970,

12  971-72 (E.D. Cal.1997).

13         First, if the motion attacks the complaint on its face, often referred to as a facial

14  attack, the court considers the complaints allegations to be true, and plaintiff enjoys safeguards

15  akin to those applied when a Rule 12(b)(6) motion is made. <u>Doe v. Schachter,</u> 804 F.Supp. 53, 56

16  (N.D. Cal.1992).  Presuming its factual allegations to be true, the complaint must demonstrate

17  that the court has either diversity jurisdiction or federal question jurisdiction.  For diversity

18  jurisdiction pursuant to 28 U.S.C. § 1332, plaintiff and defendant must be residents of different

19  states.  For federal question jurisdiction pursuant to 28 U .S.C. § 1331, the complaint must either

20  (1) arise under a federal law or the United States Constitution, (2) allege a "case or controversy"

21  within the meaning of Article III, § 2, or (3) be authorized by a jurisdiction statute.  <u>Baker v.</u>

22  <u>Carr</u>, 369 U.S. 186, 198, 82 S. Ct. 691, 699-700, 7 L.Ed.2d 663 (1962).

23         Second, if the motion makes a "factual attack" on subject matter jurisdiction,

24  often referred to as a "speaking motion," the court does not presume the factual allegations of the

25  complaint to be true.  <u>Thornhill</u>, 594 F.2d at 733.  In a factual attack, defendant challenges the

26  truth of the jurisdictional facts underlying the complaint.  "Faced with a factual attack on subject

1  matter jurisdiction, the trial court may proceed as it never could under Rule 12(b)(6).... No

2  presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material

3  facts will not preclude the trial court from evaluating for itself the merits of jurisdictional

4  claims." Id. (quotations and citation omitted).  The court may hear evidence such as declarations

5  or testimony to resolve factual disputes.  Id.; McCarthy v. United States, 850 F.2d 558, 560 (9th

6  Cir.1988).[7]

7          II.  Summary Judgment of Non APA Claims[8]

8              The "purpose of summary judgment is to pierce the pleadings and to assess the

9  proof in order to see whether there is a genuine need for trial." Matsushita Elec. Indus. Co. v.

10  Zenith Radio Corp., 475 U.S. 574, 587 (1986).  Summary judgment is appropriate when it is

11  demonstrated that there exists "no genuine dispute as to any material fact and that the movant is

12  entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Under summary judgment

13  practice, the moving party

> always bears the initial responsibility of informing the district court
> of the basis for its motion, and identifying those portions of "the
> pleadings, depositions, answers to interrogatories, and admissions
> on file, together with the affidavits, if any," which it believes
> demonstrate the absence of a genuine issue of material fact.

17  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

18  /////

19

---

20      [7] If the jurisdictional issue is intertwined with the merits of the case, the trial court cannot
determine the jurisdictional issue until such facts are appropriately resolved. See Roberts v.
21  Corrothers, 812 F.2d 1173, 1177-78 (9th Cir.1987); see also Trentacosta v. Frontier Pac. Aircraft
Indus., 813 F.2d 1553, 1558 (9th Cir.1987) (summary judgment standard applied if motion
22  determines facts where jurisdictional issue and merits are intertwined).

23      [8] The amended complaint contains a claim for violation of procedural due process in
addition to the APA claim.  A direct constitutional challenge is reviewed independent of the
24  APA. Porter v. Califano, 592 F.2d 770, 781 (5th Cir. 1979).  As such the court is entitled to look
beyond the administrative record in regard to this claim.  5 U.S.C. §706(2)(B); Porter, 592 F.2d
25  at 780, Rydeen v. Quigg, 748 F. Supp. 900, 906 (D.D.C. 1990); see McNary v. Haitian Refugee
Center, Inc., 498 U.S. 479, 493, 111 S.Ct. 888, 896-97 (1991) (discussing similar issue under the
26  IRCA.

1           If the moving party meets its initial responsibility, the burden then shifts to the

2    opposing party to establish that a genuine issue as to any material fact actually does exist.  See

3    Matsushita, 475 U.S. at 585-86.  In attempting to establish the existence of this factual dispute,

4    the opposing party may not rely upon the allegations or denials of its pleadings but is required to

5    tender evidence of specific facts in the form of affidavits, and/or admissible discovery material,

6    in support of its contention that the dispute exists.  See Matsushita, 475 U.S. at 586.  The

7    opposing party must demonstrate that the fact in contention is material, i.e., a fact that might

8    affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477

9    U.S. 242, 248 (1986); T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630

10   (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury

11   could return a verdict for the nonmoving party, see Anderson, 477 U.S. at 248.

12          In the endeavor to establish the existence of a factual dispute, the non-moving

13   party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

14   claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

15   versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 630.  The evidence of the non-

16   moving party is to be believed and all justifiable inferences are to be drawn in its favor.  See

17   Anderson, 477 U.S. at 255.  Nevertheless, inferences are not drawn out of the air, and it is the

18   opposing party's obligation to produce a factual predicate from which the inference may be

19   drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985),

20   aff'd, 810 F.2d 898 (9th Cir. 1987).  To demonstrate a genuine issue, the opposing party "must

21   do more than simply show that there is some metaphysical doubt as to the material facts . . . .

22   Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving

23   party, there is no genuine issue for trial."  Matsushita, 475 U.S. at 586-87 (internal citation and

24   quotation omitted).

25   /////

26   /////

1   DISCUSSION

2       I.  Plaintiff's Request to Introduce Evidence into the Record

3           On January 9, 2013, plaintiff filed a belated request to introduce documents not

4   previously provided by defendant into the Administrative Record for consideration on summary

5   judgment.  (See Dkt. no. 86.)  Plaintiff contends that two documents attached to this request were

6   not discovered until January 7, 2013, through a related state court action.

7           Exhibit B is a letter from private attorney Alexander Constantino to Julie Lydick,

8   District Ranger in the Nevada City Ranger District, dated April 30, 1996, which proposes

9   changes to certain language in the Special Use Permit application on behalf of James Grill, after

10  his discussions with Richard Flynn, Office of the General Counsel.  A comparison of Exhibit B

11  to the Administrative Record indicates that it is the same document already made part of the AR

12  at 515, but contains handwritten notes which plaintiff ascribes to Julie Lydick by virtue of her

13  admission in her May 31, 1996 letter, which apparently is not part of the AR.

14          Exhibit A is a response letter from Julie Lydick to Constantino, dated May 31,

15  1996, which discusses her pen and ink changes to his proposal (Ex. B), based on her consultation

16  with Richard Flynn, as supported by the CFR provisions which she attached to the letter.  Her

17  letter states that she was prepared to issue the Special Use Permit to Grill with the revised

18  language.  One significant potential change she made to Constantino's proposed language was to

19  eliminate the term that the Permit would be renewed for successive ten year periods.  She wanted

20  language stating only that the Permit would be renewed where authorized by law if the road was

21  still being used for the purpose previously authorized.  She states that new applications must be

22  evaluated under NEPA, but renewals and transfers are evaluated pursuant to the previously

23  authorized purpose and dependent upon whether any change in law requires modifications.

24  Thus, unlike new applications, "renewals and transfers simply require an evaluation whether the

25  use is for the previously authorized purpose, and whether modifications are necessary to reflect

26  any new requirement imposed by Federal and State land use plans, regulations, or other

13

1   management decisions.  Any future analysis we do for renewal or transfer would be very limited

2   in scope based on the regulations, unlike what we did for the initial processing of the permit."  At

3   the end of her letter she states, "[i]t is time to bring closure to this application process, and issue

4   the permit."  (Dkt. no. 86, Ex. A.)

5          These discussions reflected in plaintiff's additional exhibits are not relevant

6   because the SUP as issued, for whatever reason, did not reflect the discussed terms.  The SUP

7   provides that when it expires, it "will be reissued for successive periods of 10 years.  At the time

8   of reissuance, the terms and conditions may be modified and new conditions or stipulations

9   added at the discretion of the Forest Service."  (AR 594.)  The language of this Permit was not

10  modified over the years.  Moreover, the District Ranger's legal assertions about renewals,

11  although favorable to plaintiff, are simply a non-lawyer's legal conclusions.  The law is what it

12  is, and a District Ranger's views on the law, whether correct or not, are immaterial.  Therefore,

13  plaintiff's motion to include these exhibits as part of the Administrative Record is denied.

14       II.  <u>Contentions and Principles Regarding Standing</u>

15         The Forest Service argues first that plaintiff has no standing because on

16  November 26, 2012, the property was foreclosed upon, and therefore, the court lacks subject

17  matter jurisdiction.  (Def.'s Ex. A.)  In opposition, plaintiff argues that he has suffered injury in

18  fact because the property became valueless and unmarketable after defendant's actions in 2007

19  and 2008.  He further asserts that defendant's rescission of the access improvement building

20  permits led to the 2008 termination of the Permit.  He claims his injuries have been compounded

21  because third parties are looking to him for deficiency claims following the foreclosure based on

22  the loan guaranty agreement and covenants of warranty to these third parties, all caused by the

23  devaluation of the property due to lack of access to the property.  Finally, plaintiff argues that his

24  /////

25  /////

26  /////

1   liabilities to these third parties will be redressed by restoration of the Permit and access which

2   will restore the value and marketability of the property.[9]

3            The current version of the complaint seeks relief in the form of declaratory and

4   injunctive relief only, along with costs and attorney's fees.  (Dkt. no. 21-2, FAC at 22-24.)  The

5   proposed Second Amended Complaint seeks to modify paragraphs C and D in the FAC which

6   called for declaratory relief and substitute the following language in the paragraphs:

7            A.  Plaintiff will prepare engineering drawings, at his own cost, for
          a bridge that completely spans the Creek at the site of the Historic
8            Bridge crossing as shown on the Exhibits A and B mentioned
          heretofore using a pre-engineer railroad flat car.  No fill will be
9            placed in the stream bed as a result of the construction.
          B.  Defendants review and approval of the pre-engineered
10           proposed bridge are reasonably consistent with industry standard
          building departments processing and timing criteria.
11           C.  Plaintiff will supplement the existing EA, at his own costs,
          regarding the investigation of new threatened or sensitive species
12           provided that are prepared and submitted to Defendants by outside
          consultants.  The choice of consultants will be selected from a list
13           of consultants previously used by, and approved by, the
          Defendants.  Furthermore, Defendants review and approval period
14           may not be unreasonably lengthy and that the approval of the
          consultants findings and conclusions will not be unreasonably
15           withheld.

16   (Dkt. no. 73 at 4.)  Plaintiff continues to seek injunctive relief only.

17            Article III of the Constitution requires concrete cases and controversies before the

18   judicial power vests in the Article III courts.  This doctrine is often termed a party's standing to

19   pursue claims.  If a plaintiff has no standing, the court has no subject matter jurisdiction.

20           "[B]efore reaching a decision on the merits, we [are required to]
          address the standing issue to determine if we have jurisdiction."
21           Nat'l Wildlife Fed'n v. Adams, 629 F.2d 587, 593 n. 11 (9th
          Cir.1980).  "[T]he standing question is whether the plaintiff has
22           'alleged such a personal stake in the outcome of the controversy' as

23

24   _____
     [9]   In a separate filing, plaintiff argues that he has standing despite the foreclosure because
     "he personally guaranteed the note and deed of trust that are the subject of the foreclosure.
25   Having guaranteed the note, he will have personal liability for any deficiency value of the
     Property that the lender will inherit because of lack of access.  Considering that the lender['] s
26   claim is in excess of $750,000, there most certainly will be a very significant deficiency."  (Dkt.
     no. 77 at 2.)

to warrant his invocation of federal-court jurisdiction and to justify the exercise of the court's remedial powers on his behalf." Warth v. Seldin, 422 U.S. 490, 498- 99, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (quoting Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)).  There are three requirements for standing: (1) "a plaintiff must have suffered an 'injury in fact'--an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not 'conjectural' or 'hypothetical,'" (2) "there must be a causal connection between the injury and the conduct complained of--the injury has to be 'fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court;'" and (3) "it must be 'likely' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'"  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (citations omitted) (alterations in original).

Washington Legal Foundation v. Legal Foundation of Washington, 271 F.3d 835, 847 (9th Cir. 2001) (en banc).

Especially important here is the requirement that there be some type of relief that can be awarded to plaintiff.  Otherwise the court's ruling on the merits of a claim would be an academic exercise only.  "[T]o satisfy Article III's standing requirement, a plaintiff must show...it is likely, as opposed to merely speculative that the injury will be redressed by a favorable decision." Friends of the Earth Inc.v. Laidlaw, etc., 528 U.S. 167, 180-81, 120 S. Ct. 693 (2000). See also Isaacson v. Horn, __F.3d__, 2013 WL 2160171 *4 (9th Cir. 2013).  Closely related to this aspect of standing is the mootness doctrine, which is also of jurisdictional magnitude: A claim is moot when the court lacks power to issue effective relief. Feldman v. Bomar, 518 F.3d 637, 643 (9th Cir. 2008).

Also, "[g]enerally, a plaintiff may only bring a claim on his own behalf, and may not raise claims based on the rights of another party." Pony v. County of Los Angeles, 433 F.3d 1138, 1146 (9th Cir. 2006).

However, where the claim consists of the alleged violation of a procedural right, a plaintiff need not show the immediacy and redressability requirements of standing. Din v. Kerry, __F.3d__, 2013 WL 2249289 *10 (9th Cir. 2013).

16

1   These principles of standing will be addressed below as they apply to each

2   remaining claim.

3      III.  APA Claim

4   The principles which defeat plaintiff's standing for an alleged APA violation stem

5   from the nature of an APA claim itself.  Only a type of injunctive relief/agency remand may be

6   sought for an APA claim -- which is not available to plaintiff because he is no longer owner of

7   the Parcel for which the SUP was issued.  And, the new owner of the Parcel must seek his own

8   special use permit as plaintiff's SUP (even assuming its viability today) is *not* transferrable.  No

9   relief on a favorable decision could be granted to plaintiff herein, and he therefore lacks standing.

10   "An injunction is the appropriate remedy for a substantive procedural violation of

11   an environmental statute."  Amoco Production Co. v. Village of Gambell, 480 U.S. 531, 556 n.*,

12   107 S. Ct. 1396 (1987) (Stevens, J., concurring).  Under the APA,  "relief other than money

13   damages" is available against a federal agency to remedy a "legal wrong."  Sossamon v. Texas,

14   131 S. Ct 1651, 1665 (2011) (Sotomayor, J., dissenting); 5 U.S.C. § 702.  "Section 702 generally

15   waives the sovereign immunity of the United States in agency review actions "'seeking relief

16   other than money damages.'"  Kansas v. U.S., 249 F.3d 1213, 1222 (10th Cir. 2001).  See Florida

17   Power & Light Co. v. Lorion, 470 U.S. 729, 744 105 S. Ct. 1598 (1985) (finding that "the proper

18   course, except in rare circumstances, is to remand to the agency for additional investigation or

19   explanation"); Jones v. Gordon, 792 F.2d 821, 829 (9th. Cir. 1986) (holding that district court

20   had no authority to order agency to prepare environmental impact statement, despite agency's

21   unreasonable decision not to prepare one, and remanding for agency to consider NEPA's

22   requirements and provide reasoned explanation of "whatever course it elects to pursue"); Metcalf

23   v. Daley, 214 F.3d 1135, 1146 (9th Cir. 2000) (finding in light of court's limited role in process,

24   it was not appropriate to order an Environmental Impact Statement but only to order a new

25   environmental assessment).

26   /////

1          Money damages as a form of relief against federal agencies is not permitted under

2    the APA.  Only specific or injunctive relief is allowed.  <u>Alcoa, Inc v. Bonneville Power Admin.</u>,

3    698 F.3d 774, 806 (9th Cir. 2012); <u>EEOC v. Peabody Western Coal Co.</u>, 610 F.3d 1070, 1086

4    (9th Cir. 2010); <u>Western Radio Services Co. v. U.S. Forest Service</u>, 578 F.3d 1116, 1123 (9th

5    Cir. 2009).  In contrast, an award of funds to which a litigant is entitled under a statute does not

6    constitute money damages, but rather specific relief and redressability for standing may be found.

7    <u>Western Radio Services</u>, <u>supra</u>; <u>America's Community Bankers v. F.D.I.C.</u>, 200 F.3d 822, 829

8    (C.A.D.C. 2000). Such is not the case here. [10]

9          It is undisputed that plaintiff  no longer owns the Parcel as it was the subject of

10   foreclosure.  <u>See</u> Exhibit A to Defendant's Motion for Summary Judgment and plaintiff's

11   concession as to this fact at Opposition, p. 2.  It is elementary that the relief plaintiff seeks would

12   not benefit him because he is not the landowner.  Requesting that he be able to build a bridge

13   across the stream bed at issue, as he requests in the proposed SAC, will not benefit *him*.  Thus,

14   there is no type of APA relief which could be awarded to plaintiff.

15          Plaintiff might argue that he could seek an agency order requiring it to reinstate,

16   or reissue, his SUP, ostensibly so that he can give it to the new landowner.  However, plaintiff

17   would then be attempting to assert the rights of others to build the bridge – the present owner

18   who is not a party to this suit.  Moreover, even if plaintiff could represent the new owner, it is

19   established in this case that special use permits are not transferrable.

20          The Forest Service correctly points to regulations providing that a Special Use

21   Permit is not transferrable.  36 C.F.R. § 251.59.  This section provides that if the holder of the

22   authorized improvements ceases to be the owner of those improvements, the authorization

23   terminates with a change in ownership.  With the exception of certain leases and easements not at

24

25          [10]  With respect to plaintiff's question whether he may pursue a similar claim in the Court
     of Federal Claims, this court will not give an advisory opinion, and has no authority to predict
     what a different court would do.  Plaintiff is advised, however, that he may face statute of
26   limitations problems.

1   issue here[11], the new owner must apply for a new special use authorization.[12]  Id.  Plaintiff cites

2   to a 1988 version of this regulation which previously permitted transfer of a SUP.  (Dkt. no. 86 at

3   8.)  See Adams v. U.S., 255 F.3d 787, 793 (9th Cir. 2001) (noting regulation at that time

4   provided for transfer of "most" permits upon application and approval of an authorized officer).

5   See 65 FR 65950-01 (clarifying that with the exception of certain easements, special use permits

6   expire on sale, death etc.)  Therefore, plaintiff's argument that restoration of the Permit and

7   access to the property will restore the value of the property to plaintiff's creditors and redress his

8   injury, is of no merit as it will not benefit him even if his "restorative" theory were correct in

9   ordinary practice.[13]

10         Further, the sale of property subject to a permit results in termination of such

11   permit by operation of law.  R.M. Inv. Co. v. U.S. Forest Service, 2006 WL 2560693, *1 (D.

12   /////

13   /////

---

14   [11]  36 CFR 251.53 (l) involves road easements authorized under the Federal Land Policy
15   and Management Act, but not ANICLA.

16   [12]  The full text of this section states:

17         If the holder, through death, voluntary sale, transfer, or through
         enforcement of a valid legal proceeding or operation of law, ceases
18         to be the owner of the authorized improvements, the authorization
         terminates upon change of ownership. Except for easements issued
19         under authorities other than § 251.53(e) and leases and easements
         under § 251.53(l) of this subpart, the new owner of the authorized
20         improvements must apply for and receive a new special use
         authorization. The new owner must meet requirements under
21         applicable regulations of this subpart and agree to comply with the
         terms and conditions of the authorization and any new terms and
22         conditions warranted by existing or prospective circumstances.

23   36 C.F.R. § 251.59.  (Again, a section 251.53(l) easement is not applicable here.)

24

25   [13]  Thus, Fed. R. Civ. P. 17, which permits substitution of the real party in interest, would
     be of no help to plaintiff here since the disputed SUP herein could not be transferred to the new
     plaintiff in any event.  If the present owner of the Parcel desires access to the Parcel over Forest
26   Service lands, the new owner must apply for his own initial special use permit.

1   Colo. Sep. 5, 2006) (citing 36 C.F.R. § 251.59).[14]   A plaintiff may not seek damages under the

2   APA based on revocation of a permit.  Id.  In R.M. Inv. Co., plaintiff filed an APA challenge to

3   the Forest Service's procedures in revoking two permits held by plaintiff to operate a lodge and

4   guide service in the White River National Forest.  The court found that once plaintiff sold its

5   property at the lodge, its permits terminated by operation of law, citing 36 C.F.R. § 251.59.  The

6   court held that "[o]nce the plaintiff's permits were so terminated, a decision by this court finding

7   that the Forest Service's revocation of those permits was procedurally improper could not have

8   an effect on the rights of the litigants in this case."  Therefore, the case was moot.

9          To the extent that plaintiff's further briefing defines his loss as the loss of the

10   property as well as $150,000 in mortgage fees and interest, and $50,000 in attorney's fees and

11   costs, (dkt. no. 91 at 3:24-26), and future liabilities of $850,000 in mortgage deficiency claims,

12   (dkt. no. 91 at 4:11-12), these amounts are simply a form of monetary damages not permitted

13   under the APA.

14          IV.  Procedural Due Process Claim

15                 A.  Standing

16          In order to reach the procedural due process claim, there must first be a finding of

17   standing.  As set forth previously, without standing, the court is without jurisdiction to hear this

18   claim.  The fact that plaintiff no longer owns the property at issue is not pertinent to the

19   determination of procedural due process (except as to remedy) because the process due was

20   personal to plaintiff himself.  Therefore, any remedy would belong to plaintiff and not a new

21   owner.

22          Moreover, it is important to emphasize that standing does not depend on the

23   viability of one's claim– the latter is a distinct concept analyzed on it substantive merits.  Thus,

24

25          [14]   Unpublished district court decisions issued prior to 2007 may be cited for persuasive
      authority.  Pestube Systems, Inc. v. HomeTeam Pest Defense, LLC, 2006 WL 1441014 n.1 (D.
26   Ariz. May 24, 2006).

for purposes of standing, the undersigned will assume that due process was violated at one of three times: (1) when plaintiff was directed to not continue construction; (2) when plaintiff was told he would need to acquire (and fund) a completely new environmental assessment; or (3) when the SUP was not renewed according to its terms.  Whether in fact any process was due at these times is later analyzed.

As set forth *infra*, the standing and relief tests for standing are greatly minimized for claims involving procedural due process.  Din v. Kerry, *supra*.  As well stated by the Tenth Circuit:

> [T]he loss of a procedural right 'is itself an injury' sufficient to provide standing 'without any requirement of a showing of further injury.' Bertulli v. Independent Ass'n of Continental Pilots, 242 F.3d 290, 295 (5th Cir.2001). Additionally, "the right to procedural due process is 'absolute' in the sense that it does not depend upon the merits of a claimant's substantive assertions and [therefore] the denial of procedural due process [is] actionable for nominal damages without proof of actual injury." Carey v. Piphus, 435 U.S. 247, 266, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978).

Wessel v. City of Albuquerque, 299 F.3d 1186, 1193 (10th Cir. 2002).  See also Coates v. Hall, 512 F.Supp.2d 770, 781 (W.D. Texas 2007) (finding plaintiffs had procedural due process claim for non-economic damages sufficient for standing despite lack of proof of actual injury where plaintiffs had not yet been issued a permit).  Substantial damages also may be awarded to compensate actual injury as long as there is proof of the injury.  Carey, 435 U.S. at 266-67, 98 S. Ct. 1042.  Procedural due process claims may proceed without proof of damages because "[a] procedural due process claim, unlike negligence and takings claims, is not rooted in the notions of adequate compensation and economic restitution but is based on something more – an expectation that the system is fair and has provided an adequate forum for the aggrieved to air his grievance.  Aspirations of ensuring procedural due process are founded on a hope that the process of dispute resolution will be just, even when the substantive outcome is not." Weinberg v. Whatcom County, 241 F.3d 746, 752 (9th Cir. 2001).

21

The fact that plaintiff lost his property does not moot his claim for procedural due process because he can potentially recover at least nominal damages.  Carey, 435 U.S. at 266-67. Although Carey did not specifically address the issue of mootness, it implied that a case is not moot as long as plaintiff seeks to vindicate his constitutional right through a claim for nominal damages because such a recovery was warranted due to "the importance to organized society that procedural due process be observed."  Id. at 266.

> A live claim for nominal damages will prevent dismissal for mootness.  See, e.g., Beyah v. Coughlin, 789 F.2d 986, 988-89 (2d Cir.1986) (holding that, although plaintiff's claims for prospective relief may have been moot, case was not moot where complaint sought compensatory and punitive damages because plaintiff might be entitled to recover nominal damages even if plaintiff could not establish actual damages); Lokey v. Richardson, 600 F.2d 1265, 1266 (9th Cir.1979) (per curiam) (holding that, although claim for injunctive relief was mooted, case was not moot because plaintiff prayed for damages and, regardless of actual damages, plaintiff could be entitled to nominal damages); see also Knight v. Kenai Peninsula Borough Sch. Dist., 131 F.3d 807, 812 (9th Cir.1997) (holding that, although actual damages claim might be rendered moot, case was not moot because plaintiff could still obtain nominal damages); Chew v. Gates, 27 F.3d 1432, 1437 (9th Cir.1994) (same).

Bernhardt v. County of Los Angeles, 279 F.3d 862, 872-73 (9th Cir. 2002).[15]

In this case, a claim could be made that plaintiff's due process rights were violated at one of three possible times, when he was informed to stop work on the bridge on September 28, 2007; when he received the "back to square one" letter on October 5, 2007 (SUP effective termination); or when his SUP was not renewed.  If process was due at any one of these times, plaintiff was the one injured, and thus the remedy is his to pursue, not that of the new owner. Therefore, plaintiff has standing to proceed with his procedural due process claim.  The fact that his complaint does not seek damages is not fatal.  It can be amended to seek damages only,

---

[15] But cf. R.M. Inv. Co., 2006 WL 2560693, *1 (D. Colo. Sep. 5, 2006) (finding mootness in regard to an APA challenge based on termination of permits because court order could not affect litigants where no permit was in effect).

1  provided that plaintiff overcomes summary judgment on the merits of his due process claim.

2        The same cannot be said of any claim for injunctive relief, i.e., ordering the Forest

3  Service to provide a hearing or other process at this time.  Along this vein, the related

4  requirements of a live controversy and lack of mootness must be considered.

5        For the very same reasons discussed in the previous APA section, the court is

6  without power to issue an order directing the agency to review the three actions, or any one of

7  them, because plaintiff no longer owns the property, and consequently does not own the right to

8  future process which could permit construction, or a cancellation of any new environmental

9  assessment requirements, or the reissuance of a special use permit.  As to plaintiff, these matters

10  have become moot. His loss of the property has extinguished his ability to hold a special use

11  permit for property which is not his; no transfer of a SUP is possible because the law precludes

12  such transfer.

13        Thus, the action may proceed, if at all, only on a claim for damages as a result of

14  an alleged denial of due process.  Whether due process was in fact required is reviewed below.

15        B.  Evidence Presented

16        The record demonstrates a hodge podge of reasons why the Forest Service

17  effectively terminated the SUP or, on the other hand, believed that it had expired by its own

18  terms and would not be renewed.  Some reiteration of the facts is required.

19        Supplemental documents were filed with the court on January 26, 2012.  They

20  include an email from Greg Schimke to plaintiff, dated July 31, 2007, which states that the

21  "Forest Service has approved your submitted bridge design and will amend your existing special

22  use permit for the road access, to allow immediate construction pending submittal of a "Stream

23  Alteration Permit (1600) to be issued by the California Department of Fish and Game."  (Dkt. no.

24  49, Ex. C.)  On September 27, 2007, Mr. Schimke sent plaintiff another email, stating that the

25  wildlife biologist for the Forest Service was at the site and had some concerns, and that the

26  Forest Service was preparing a formal letter to explain the issues.  Plaintiff was advised not to

23

proceed with any plans or surface disturbing activities pending further notification.  (Id., Ex. D.)

Next came the "Back to Square One" letter of October 5, 2007.  (AR 920.)  This letter from the Forest Service states that Grill's engineered bridge proposal was reviewed based on the EA signed on November 27, 1995.  Specifically, "[y]our proposed bridge does not meet the environmental requirements that were part of the decision."  (Id.)  The reasoning given was that the proposed bridge did not completely span the creek as required by the EA.  This letter noted that since the Permit was due to expire on December 31, 2007, so much time had passed since the EA was issued, and the engineering stipulations were never issued or agreed upon by both parties, the EA would need to be revised.  Furthermore, surveys would need to be conducted to determine which plants and animals were listed as sensitive since 1995 when the last EA was issued.  Plaintiff was informed that none of this would be done until an agreement was reached and plaintiff had provided funding to complete an analysis.  (Id.)  The letter concludes: "You may not cross the creek with machinery or vehicles until you have obtained a State of California, Department of Fish and Game Stream Bed Alteration permit, and until you have written authorization from the Forest Service District Ranger."  (Id.)

At this time, plaintiff was also requesting that the SUP be extended for another ten years according to its terms (or believed it to have been automatically extended upon his request).  (AR 922, 930.)  The pertinent portion of the Permit states:

> 20.  Unless sooner terminated in accordance with the provisions of the permit, this permit shall expire and terminate on December 31, 2007.  At that time, if the permittee still needs the road for the pu[r]poses for which the permit is granted, the permit will be reissued for successive periods of 10 years.  At the time of reissuance, the terms and conditions may be modified and new conditions or stipulations added at the discretion of the Forest Service.

(AR 591-94).

No explicit denial of the renewal request appears in the record.  The record reflects only that the Forest Service believed the SUP to have been "expired" or "terminated."

1   On February 8, 2008, Mr. Schimke informed plaintiff that the bridge had to have

2   been constructed by the first expiration date, and that a new "proposal" had to be submitted

3   pursuant to updated environmental standards.  (AR 931.)  The part of the permit which required

4   construction by a date certain is not referenced (and the SUP contains no such requirement, see

5   AR 591).  Nevertheless, by letter of April 2, 2008, this rationale was again repeated, and the SUP

6   was held to be "terminated" because of this deficiency.  (AR 958.)  Again, a new "proposal"for a

7   SUP would have to be submitted and considered pursuant to updated environmental

8   requirements.  Id.

9   By August 8, 2008, the Forest Service, without recognizing any of the previous

10  history, indicated to plaintiff that a road request was inappropriate because he really was not

11  landlocked by government property, and an application for a SUP would have to be made in any

12  event.  (AR 968.)

13  Plaintiff had made several appeal requests in early 2008 (precise date uncertain in

14  the record) concerning the various positions espoused by the Forest Service.  See AR 942.

15  Assuming a conclusion the appeal might have resolved, the Forest Service determined that

16  plaintiff was not entitled to appeal because the bridge design had not complied with the 1995 EA.

17  (AR 941, 942.)  It is undisputed that plaintiff was never given notice of appeal rights.

18  C. The Procedural Due Process Issues

19  Plaintiff's SUP was effectively terminated in October 2007, when he was

20  informed that a new environmental assessment and species survey (at his expense) would have to

21  be performed before any of the construction authorized by the SUP could commence.  The

22  parties, and especially the Forest Service, through their briefing, evince a conflation of issues

23  concerning whether some type of due process was required to terminate the SUP and their

24  conclusions about who was correct on the merits of the dispute.  The record also reflects a

25  misunderstanding of the issuance of a SUP with documents which underlie its issuance.

26  /////

1       First, under the terms ANICLA, and the factual understandings in the 1990s, the

2   issuance of a SUP was mandatory.  "Notwithstanding any other provision of law, and subject to

3   such terms and conditions as the Secretary of Agriculture may prescribe, the Secretary shall

4   provide such access to [private] land within the boundaries of the National Forest System as the

5   Secretary deems adequate to secure to the owner the reasonable use..." 16 U.S.C. section

6   3210(a).  Although the words of the statute clearly anticipate that the permit will be governed by

7   terms and conditions, see Adams v. United States, 255 F.3d 787, 795 (9th Cir. 2001), and is

8   necessary to afford reasonable use, the Secretary has no discretion to simply decide not to issue a

9   permit at all despite the wording of the statute.[16]  Thus, the first issue to be decided under the law

10  discussed below, is whether the SUP was a sufficient property interest to warrant due process

11  protections.  The second issue is to define the process that was due.  Lastly, if necessary, the

12  remedy for a found violation of due process would be explored.

13      Defendant, on the other hand, argues that plaintiff was not in compliance with all

14  of the terms of the SUP throughout its duration and at the time it was set to expire, referring to

15  /////

16  /////

17

---

18      [16] The Forest Service attempts to raise the red herring issue that on second thought, and
outside the administrative record, plaintiff's land was not "completely surrounded" by Forest
19  Service property, and therefore the SUP that was issued in 1998 should not have been.  The point
here, is that an ANICLA SUP *was* issued, and whether it was terminated/not renewed without
20  required due process is the issue to be decided.
        Even if the Forest Service contention was before the court on its merits, the contention is
21  dubious.  The "completely surrounded" language of subsection 3210(b) applying to lands
administered by the Interior Department is conspicuously missing from subsection(a) applicable
22  to Forest Service administration.  One would have to take a very dim view of Congressional
legislative drafting ability to find that Congress really meant to include the "completely
23  surrounded" language of (b) in (a), but simply forgot to do it.  Statutes should be construed as
written, not as amended and superseded by courts.  With respect, the undersigned disagrees with
24  the conclusion of Bunyard v. Dept. of Agriculture etc., 301 F. Supp. 2d 1052, 1058 (D. Ariz.
2004) to the contrary.
25      Finally, the Forest Service in 1995 knew that plaintiff could theoretically access the
Parcel through private roads not involving Forest Service lands. (AR 482 (labeled as 481) at 2.)
26  Yet it issued the SUP in any event.

1  the bridge calculation designs which were never approved or agreed to by the parties.[17]

2  Defendant also refers to a stream alteration permit which plaintiff was required to obtain from the

3  State of California pursuant to the terms of the SUP, but never did.  (AR 592 at ¶ 8, 601.)  Of

4  course, as the facts show, plaintiff received the California permit, but it was later rescinded upon

5  information given by the Forest Service. (AR 894, 918.)[18]  Defendant argues that the bridge

6  design was not in conformance with the 1995 EA which underlay the issuance of the permit, i.e.,

7  that the bridge did not completely span the creek.

8        The undersigned also recognizes the Forest Service argument that plaintiff was

9  not blameless in causing his own problems in not submitting serious design proposals early after

10  the SUP was issued.  The Forest Service may be correct in that contention, but if it had merit

11  material to the termination/ failure to reissue the SUP, 2007 was the time at which to determine

12  this, not now.

13        All of these matters beg the issue of whether due process was required *at the time*

14  to prove the very things contended.

15        D.  Was the Termination of the SUP, or Failure to Reissue It, Subject to

16           Procedural Due Process[19]

17        The United States Government does not have to afford due process to everyone

18

19  [17]  The Forest Service recognizes that Mr. Schimke at one time announced the approval of the bridge design, but the Forest Service present rejoinder is that he was not authorized to do this. One wonders why Schimke was tasked at all, then, with responding to plaintiff's proposals.

20  Moreover, the Forest Service does not dispute that Schimke had the authority to tell plaintiff to stop construction.

21

22  [18]  In a separate email, dated September 12, 2007, Rick Weaver of the Forest Service informed Mr. Hosea, a California official, that Grill's 2007 proposed bridge plan would be constructed inside the Stream Zone, and furthermore, he had observed two foothill yellow-legged

23  frogs at the proposed bridge site.  (AR 911.)

24  [19]  Under the Due Process Clause, "[p]rocedural due process ensures the state will not deprive a party of property without engaging fair procedures to reach a decision, while

25  substantive due process ensures the state will not deprive a party of property for an arbitrary reason regardless of the procedures used to reach that decision."  Hyde Park Co. v. Santa Fe City

26  Council, 226 F.3d 1207, 1210 (10th Cir.2000).

whose lives are affected in some way by governmental decisions.  It is only when the interest

affected by the decision rises to the level of life, liberty or here, property interest recognized in

law, that due process is required.

> A threshold requirement to a substantive or procedural due process
> claim is the plaintiff's showing of a liberty or property interest
> protected by the Constitution. A protected property interest is
> present where an individual has a reasonable expectation of
> entitlement deriving from existing rules or understandings that
> stem from an independent source such as state law. A reasonable
> expectation of entitlement is determined largely by the language of
> the statute and the extent to which the entitlement is couched in
> mandatory terms. Although procedural requirements ordinarily do
> not transform a unilateral expectation into a protected property
> interest, such an interest is created if the procedural requirements
> are intended to be a significant substantive restriction on ...
> decision making.  Wedges/Ledges of Cal., Inc. v. City of Phoenix,
> 24 F.3d 56, 62 (9th Cir.1994) (internal citations and quotations
> omitted).

Stiesberg v. State of California, 80 F.3d 353, 356 (9th Cir. 1996)

Applying this general law to special use permits issued by the Forest Service, the

initial look at the law is unfavorable to plaintiff:

> "The law is settled that special use permits create no vested
> property rights." Paulina Lake Historic Cabin Owners Assoc. v.
> U.S.D.A. Forest Service, 577 F.Supp. 1188, 1193 (D. Or.1983);
> (see, e.g., United States v. Fuller, 409 U.S. 488, 492-93, 93 S.Ct.
> 801, 804-05, 35 L.Ed.2d 16 (1973) (further citations omitted)).
> Termination of such permits does not require compensation
> because they are not property interests recognized by the Fifth
> Amendment. See United States v. Petty Motor Co., 327 U.S. 372,
> 376, 66 S.Ct. 596, 599, 90 L.Ed. 729 (1946); United States v. 5.96
> Acres of Land, 593 F.2d 884, 889-89 (9th Cir.1979). Therefore,
> based upon the foregoing, the court finds that the facts do not
> support a claim of either a procedural due process or a Takings
> Clause violation of the Fifth Amendment.

Pai 'Ohana v. United States, 875 F.Supp. 680, 699 (D. Haw. 1995)

But the best characterization of the special use permits at issue in Pai are that they

were totally discretionary, and when special use permits are mandatory and resemble property

interest such as easements, due process may well apply.  McKay v. United States, 516 F.3d 848,

850 (fn 3) (10th Cir. 2008).  A review of the cases cited above bears out McKay's point.  Indeed,

1   U.S. v. 5.96 Acres of Land involved a permit license that was *revocable at will by the Army*

2   *Secretary* if the Secretary believed the public interest required it.  5.96 Acres, 593 F.2d at 887

3   n.4.  The special use permits discussed in Pai were "subject to revocation at the Park Services'

4   discretion."  Pai at 699.  Such is certainly not the case here where the terms of the SUP were

5   required by statute and itself guaranteed renewal if the road was still necessary to reasonably

6   access the parcel.  See also Langan v. Town of Cave Creek, 2007 WL 101740 (D. Ariz. 2007).

7              Again, the undersigned finds here that the SUP was akin to an easement,

8   revocable only for cause, which could not be terminated without affording at least a review of the

9   asserted cause.  This is especially so in that plaintiff, however belatedly within the term of the

10  SUP expended substantial resources in bringing a bridge and road design to the Forest Service as

11  well as expenses for attorneys' fees and the like in attempting to keep the SUP alive.

12             A final conclusion that process was due, nevertheless, must consider whether the

13  SUP was actually terminated, or the failure to consider renewal according to the terms of the

14  SUP constitutes such a termination.  The facts are muddled, and the decision to not permit the

15  SUP to be effected due to the (argued) necessity for a new EA morphed into the expiration of the

16  first SUP and the refusal to renew it.  The undersigned cannot find case law to match the precise

17  facts here, so the decision has to be made on an extrapolation of due process principle and

18  practicality.

19             There seems to be no doubt that the SUP was made a dead letter when plaintiff

20  was informed that facts and changes in the law required an entirely new environmental document

21  just months before the first SUP was set to expire.  For practical purposes, it would take many

22  months, if not years (judging from the time it took to acquire the initial EA and FONSI), to have

23  a new environmental assessment completed.  Perhaps this new assessment could have been made

24  /////

25  /////

26  /////

29

a condition of a actually issued "second" SUP, but that was not permitted to happen.[20]  And, it is without dispute that the terms of the initial SUP required its reissuance only upon a showing of need for the road. It did *not* provide that no new permit could be issued if the bridge and road were not completed during the term of the first SUP.  At the very least, the Forest Service should have permitted plaintiff to make such a showing, if the Forest Service was denying its reissuance on that basis.

The Forest Service argues that it considered giving plaintiff appeal rights but because the administrators had already determined that the bridge was not designed in conformance with the EA, no appeal [review] was permitted.  In other words, a review was only permitted if the Forest Service admitted that the bridge design satisfied all pertinent requirements, but denied authorization to commence construction anyway.  This seems to the undersigned as an unduly cribbed view of what due process actually entails.  There were in actuality many unresolved issues, both legal and factual – whether the non-constructed bridge was a "new project" in the purview of environmental laws such that new environmental documents were required; whether previously undiscovered sensitive species were in fact found at the proposed construction site; whether the proposed bridge spanned, or did not span, Scotchman's Creek, and more.  These issues required the review of an unbiased adjudicator after evidentiary and legal submissions on the competing contentions.

To set forth the argument of the Forest Service is to understand its fallacy.

Under the Forest Service's regulations, a permittee may appeal from the agency's denial of a permit, or the agency's decision to offer the permit in terms the applicant finds unreasonable or impracticable.  36 C.F.R [section] 251.86.  *See also* 36 C.F.R. Part 21, Subpart C.  Here neither situation applies: Plaintiff accepted

___

[20]  The Forest Service does not explain its insistence that an environmental document had to be prepared prior to the issuance of a special use permit instead of having a properly prepared environmental document as a condition to acting on the authorizations of the special use permit. The ANCILA statute provides that the permit "shall" be issued subject to terms and conditions. It does not provide that no permit can be issued until all environmental documentation is finalized.

the 1998 SUP and the terms and conditions it included without objection.  Plaintiff failed to comply with all the terms and conditions of the SUP and the SUP expired by its own terms when the ten year period ended.  Plaintiff has no basis for seeking to appeal the normal expiration of the SUP under its own terms.

Following the expiration of the 1998 SUP [December 2007], the Forest Service sent plaintiff a letter explaining the procedures applicable to any application for a new SUP. AR 000958-60.  Even if plaintiff were entitled to appeal from this letter, he failed to timely notify the Forest Service of his desire to appeal within the required 45 days. [citations to regulations omitted].

Cross-Motion at 16-17.

By *ipse dixit*, the Forest Service determines that plaintiff "failed to comply with all the terms and conditions" of the SUP without considering that this alleged failure would be the very thing at issue in any review.  Moreover, the Forest Service ignores its own regulations in effect at the time [21] which declared the *administration* of permits fair game for appealable decisions:

The rules of this subpart govern appeal of written decisions of Forest Service line officers related to issuance, denial, *or administration* of the following written instruments to occupy and use National Forest System lands, including *but not limited to*:
(1) Permits or ingress and egress to intermingled and adjacent private lands across National Forest System Lands, 36 CFR 212.8 and 212.10.[22]

Section 251.82 "Appealable Decisions" (emphasis added).

Certainly, when one is told that an entirely new environmental document must be prepared at the permittee's own expense to operate under a SUP (back to square one), that one is not authorized to perform the actions for which the SUP was given, that one is not in compliance

---

[21]  The regulations cited here are those in effect at the time of the termination/failure to renew the SUP.  The regulations were modified and reorganized in 2011.

[22]  There is no need to determine whether the ingress/egress permit here, authorized under ANCILA is one of the specific statutory references in the cited regulations.  There is no doubt that the SUP would be encompassed in any event by the "not limited" language of the regulation in that its purpose was identical to any permit for ingress and egress over Forest Service lands.

1  with the terms and conditions of the SUP – such decisions involve the administration of the SUP.

2  In addition, an SUP which, by its own terms calls for automatic reissuance if the need for a road

3  still exists, involves the "issuance" of a permit.  Finally, the Forest Service contention that

4  plaintiff did not timely ask for an appeal flies in the face of the facts which demonstrate that

5  early-on plaintiff asked for but was refused any due process.  The automatic reissuance of the

6  permit in 2008 would have simply been a supplemental issue added to those encompassed by the

7  initial request for hearings.

8          And, even if the regulations which allow plaintiff an appeal for the administration

9  of ingress/egress permits did not apply to plaintiff's ingress/egress permit, an agency cannot

10  dictate to the courts the ultimate shape of the constitutional requirements such as due process.

11  Diouf v. Napolitano, 634 F.3d 1081, 1090 (9th Cir. 2011).  The undersigned has found that the

12  termination and failure to renew the SUP in the circumstances of this case affected a property

13  interest subject to due process constraints, i.e., meaningful opportunity to be heard.  Whether or

14  not the specific Forest Service regulations encompass the SUP here, the Due Process Clause

15  does.

16          Finally, the undersigned has considered the "Construction Stipulation" signed by

17  plaintiff and attached to the SUP, (AR 591), in which plaintiff agreed that the SUP could be

18  suspended without administrative review.  However, this stipulation which authorized

19  construction to commence was never signed by Forest Service personnel.[23]  The construction

20  stipulation also included its own alternative due process provisions which were not satisfied in

21  /////

22  /////

23  /////

24

25          [23]  The Forest Service, having taken the position that Greg Schimke was not authorized to approve the go-ahead for construction, cannot now claim that the Schimke authorization

26  somehow made operative the Construction Stipulation that was never signed.

1  this case, e.g. an on site review of the alleged non-compliance and time to cure.  It is therefore an

2  inoperative part of the SUP.[24]

3        E. The Type of Process Due

4        In this case, the court need not determine the precise form which due process

5  would take because plaintiff was not given *any*.  At a minimum, plaintiff should have received a

6  record review on the factual issues outlined above from a neutral Forest Service official after

7  having given plaintiff an opportunity to be heard, i.e., submission evidence and legal contentions.

8  Even this minimal amount of due process was not afforded plaintiff.  Rather, the line Forest

9  Service officials charged with administration of the SUP decided that plaintiff had violated the

10 terms of the SUP, and that was that– no further discussion.

11       F. The Available Remedies

12       In discussing possible mootness issues, the undersigned has touched upon the

13 remedies for a procedural due process violation.  See Carey v. Piphus, supra.  See also Memphis

14 Comm School Dist v. Stachura, 477 U.S. 299, 307-308 106 S.Ct. 2537 (1986) (compensatory

15 damages not available in the abstract for violation of a constitutional right, but plaintiff can

16 attempt to prove actual damages directly stemming from the violation of the constitutional right,

17 here the deprivation of adequate procedure); Jacobs v. Clark County School Dist, 526 F.3d 419,

18 426 n.19 (noting possibility of actual damages or lack of procedural due process); Merritt v.

19 Mackey, 932 F.2d 1317, 1323 (9th Cir. 1991) ("Merritt can recover for mental and emotional

20 distress caused by the denial of procedural due process if he proves actual injury.... The district

21 court thus awarded damages, not for Merritt's loss of employment, but for his denial of a hearing

22 before he was discharged").

23       However, having traveled the due process path for all this distance, plaintiff now

24 runs into the impenetrable wall of sovereign immunity.  In a point not raised by the defendant,

25

26    [24] Nevertheless, Grill's willingness to waive any administrative review might well cut the heart out of any claim for emotional distress due to a lack of due process.

1   but one that the undersigned must raise, it is well established that federal agencies cannot be sued

2   for money damages for constitutional violations. FDIC v. Meyer, 510 U.S. 471, 114 S. Ct. 996

3   (1994).  See American Premier Underwriters v. Nat. RR Passenger Corp, 709 F3d 584, 587-88

4   (6th Cir. 2013) (procedural due process).  The Secretary (Quinn) is expressly sued only in his

5   official capacity in this action which makes this action one against the federal government.  See

6   Brandon v. Holt, 469 U.S. 464, 471-72, 105 S. Ct. 873 (1985).  No monetary damages can be

7   sought against the federal government absent its consent.

8           The undersigned has previously found that plaintiff lacks standing for any

9   equitable relief.

10      V.  MOTION TO AMEND

11          Plaintiff has filed a motion to amend the FAC, seeking to amend the prayer only.

12   Plaintiff seeks to add the following relief: (1) plaintiff will prepare engineering drawings for a

13   bridge to span the creek; (2) Defendants' review of the proposed bridge plans will be consistent

14   with industry standards; (3) Plaintiff will supplement the existing EA regarding threatened or

15   sensitive species, including other conditions related to this issue.  Defendant has filed a statement

16   of non-opposition.  Based upon the court's finding that plaintiff has no standing for the APA

17   claim, plaintiff's motion to amend will be denied.

18          Based on a finding of a procedural due process violation, however, the court

19   would construe the FAC to include a prayer for damages.  But again, there is no official or entity

20   in this lawsuit from whom damages can be obtained.  Quinn is not a viable defendant in his

21   individual capacity – he is not mentioned as having any direct or supervisorial role in Grill's

22   case.  Moreover, at this juncture, the undersigned is not inclined to allow Grill to amend yet

23   again to attempt to state a Bivens claim against the District Ranger or Forest Supervisor in their

24   individual capacities, especially since there may be only nominal damages available, and

25   qualified immunity would probably be applicable in any event.

26   /////

CONCLUSION

For the reasons stated herein, IT IS ORDERED that:

1.  Plaintiff's motion to amend the First Amended Complaint, filed October 24, 2012, (dkt. no. 73), is denied.

2.  Plaintiff's request to introduce documents into the administrative record, filed January 9, 2013 (dkt. no. 86), is denied.

IT IS HEREBY RECOMMENDED that:

1.  Plaintiff's motion for summary judgment, filed October 24, 2012, (dkt. no. 72), be denied as to his APA ( ANCILA) claim and denied as to his procedural due process claim based on the fact that no remedy exists for the found violation in the circumstances of this case;

2.  Defendant's cross-motion for summary judgment, filed December 6, 2012, (dkt. no. 83), be granted insofar as the APA (ANCILA) claim should be dismissed for plaintiff's lack of standing, and granted insofar as plaintiff's procedural due process claim is ultimately barred by lack of standing (injunctive relief) and sovereign immunity (damages); and

3.  This case be closed.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: June 17, 2013

/s/ Gregory G. Hollows
UNITED STATES MAGISTRATE JUDGE

GGH5/076:Grill757.sj.wpd

35